AQS Lumber Co., Inc. *v.* Heathman

No. 42520          January 28, 1963          149 So. 2d 335

*Clark, Townsend & Davis,* Indianola, for appellant.

*Cooper & Allen,* Indianola, for appellee.

LEE, P. J.

Mrs. Wilma K. Heathman, by her bill of complaint, sought to prevent AQS Lumber Company, a domestic corporation, from foreclosing, on February 16, 1962, a deed of trust for $3,050 which she had executed on July 26, 1961, and which secured the payment of a series of notes due September 15, November 1, and December 31, 1961. The chancellor ordered the issuance of a temporary injunction upon the giving of a good and sufficient bond in the sum of $1,000.

The original and amended bills of complaint set forth in great detail the terms of the contract between the parties whereby the Lumber Company undertook to build a skating rink for the complainant; the considerations of the contract and its payment by means of borrowing money from the Bank of Indianola and the balance payable by the complainant as evidenced by a second deed of trust; the improper construction of an aluminum roof on the building, as a result of which it leaked and

damaged the floor, required the refund of fees from patrons during rains, and resulted in loss of patronage because of the spread of such knowledge; the complete failure of the defendant to remedy the leaky condition; the impossibility of complainant's position in having borrowed $16,000, which the defendant had already received, and also obligated herself to pay the defendant over $3,000 more to get her building, and then not have one in which to operate the skating business because the defendant had not complied with its agreement. She alleged that she did not have a full, complete and adequate remedy at law, and pointed out her difficulty in showing that much of her proof in a court of law would not be speculative. She sought the performance of the contract, and to that end, she prayed that the damage, which she had sustained, be first adjudicated, and that foreclosure be permitted only for any balance to which the notes might amount over and above the aggregate amount of the ascertained damage to her. There was also a prayer for general relief.

The defendant, in its answer, denied all of the material allegations of the bill, and, in addition, set up several grounds of demurrer. In addition, it sought certain relief by cross bill.

After final hearing, the decree overruled the demurrers and continued the injunction in effect until the defendant completed the building by furnishing the complainant a satisfactory roof. It granted to the complainant an offset of $2,800 against the defendant's claim, but provided that the defendant could satisfy this offset either by completing the contract, including the furnishing to complainant of a satisfactory roof with a five-year guarantee, or crediting the notes with that amount. No attorneys fees or other fees were allowed. Certain relief was granted to defendant on its cross bill but that phase of the case is not in controversy. From the decree entered, the defendant appealed.

Mrs. Heathman testified that she knew nothing about building construction but that she had a general idea, gained from skating rink people, as to the size, etc. that her building should be; that she explained this to Kennedy Quick, the managing head of the defendant-company; that she wanted a building 120 by 54 feet; that Quick agreed for his Company to prepare the plans and details and erect the building for $18,650, with $16,-000 being paid from the proceeds of a loan which she would obtain from the Indianola Bank, and $2,650 to be due upon completion (July 27th) and be secured by a second deed of trust which she would give on the building, with $650 payable September 15, $1,000 on November 1, and a balance of $1,000 on December 31, 1961. The floor was laid while the roof was still leaking. She executed the notes and deed of trust before the building was completed on the assurance of Quick that the roof had been repaired. On that same date, he had executed a warranty for the Company that "the roof on said building will not leak and agrees to do any and all things necessary for said period of time of one year to repair any leaks, immediately, which have appeared or which may appear, and to move with dispatch in doing so * * * without charge to owner * * *." But shortly after, while she was in the hospital, her husband reported that the roof was leaking, and she complained over the telephone to the defendant's office about it. After every hard rain, it literally poured into the building. She used bottles, pans and vessels of all kinds to catch the leaking water, and it splashed over the floor and made it wet and slick in many places. This condition made the floor dangerous to skaters. On at least three occasions, she had to refund fees which had been collected from skaters during the program period when it began to rain. Besides, the report spread that there could be no skating after it rained, and her patronage shrank during cloudy or rainy weather. The

defendant finally put another roof on the building, but, evidently because of improper construction, it continued to leak as bad or worse than it had at first. On one occasion there was a hailstorm and people picked up hands full of hail which had come through the roof. You could look up and "see daylight" through the roof when the sun was shining. Testifying at the trial in May 1962, she said: "today there must be at least one hundred leaks in the roof." She said that, a few days before beginning the foreclosure proceedings, the defendant started another mere temporary measure of painting the roof in the hope that this might cover up the holes for a few days. But she sent an experienced man to examine the roof and found that this was a mere temporary measure.

John F. Rose, a roofer, with thirty years experience, testified that the cost of a B-crimp aluminum roof on this building would be approximately $2,800. Corrugated roofing must have an overlap of two and one-half corrugations; and, if there is improper lapping, the only way to repair is to take it off and put it on right— it will never do to put one over the other.

Lawrence Beck, a carpenter with fifteen years experience, testified that he patched the floor with plastic wood where wet spots were caused from leaks in the roof. He had stood on the inside, looked up, and "seen daylight shining through." That was after the second roof had been put on. It was a poor job. Carpenters missed the ramp with the nails. The seams of the second roof were exactly over those of the first. The lap was only one-half of a corrugation. The nails pulled it down flat and let the water run over it. There was no corrugated ridge row. He saw evidence of aluminum asphalt, referred to by Mrs. Heathman as paint, and said that it is purely temporary — in hot weather, it expands, and in cold weather, it draws up and breaks loose. He said that, if the first roof is leaking, a second roof, if

placed directly over it, will leak also; and that this was true in this case.

About ten witnesses, who had been in the skating rink on many and various different occasions when it was raining, testified about the roof's leaking and the use of vessels of different kinds in an effort to catch the water.

Kennedy Quick testified about how the contract was entered into. He admitted that he had some doubt, at the time of the laying of the first roof, whether it was being done correctly; but that his foreman seemed sure that he was doing it right. However, when the roof was on, it leaked; and the witness admitted that it was put on wrong in the first instance. Some patching was carried on, but he became aware that the workmen were making more leaks when they were repairing it. An aluminum company recommended that he glaze the roof with one of their products, which they guaranteed for two years, but he declined to do this because he was obligated to give a better roof of longer life. The Company then laid a second roof, which cost $1,500. After several rains, he had no complaint; but one time when he was out of town, there was a downpour and some leaks appeared. He sent his men to apply additional material and he said that he had not heard any complaints since that time. He admitted that those for whom he installed roofs expect them not to leak and that the complainant had no way of knowing the patchwork would make the roof good, and that she had the right to assume that if anything was wrong, the defendant would make it good. He admitted that a corrugated ridge row was not used and that this was because the manufacturer did not have one to fit. He contended that the use of asphalt aluminum paint was not for a temporary repair, (the opposite was expressed by Lawrence Beck), and that, if his men had been permitted to complete this

work, the building would not be in the condition that it is in today.

(**Hn 1**) The appellant contends that the court erred in ordering the issuance of a temporary injunction upon the execution of a bond in the sum of only $1,000. It contends that Sec. 1336, Code of 1942, Rec., applies, and counsel cited Tillman v. Heard, 95 Miss. 238, 48 So. 963, and Co-Operative Oil Company v. Greenwood Agency Company, 148 Miss. 536, 114 So. 397. But the Court is of the opinion that this section and these cases do not apply.

On the contrary, the injunction in this case was issued neither for the purpose of staying proceedings in an action at law for the recovery of money nor upon a judgment requiring the payment of money. Absent the two instances just stated, Sec. 1337 of the Code provides the method for the determination of the amount of bond. That section is as follows: ''Where the injunction shall not be for the stay of proceedings in an action at law for the recovery of money, or upon a judgment requiring the payment of money, the party applying for the injunction shall, before the issuance of the same, enter into bond in like manner, in a sufficient penalty, to be fixed by the judge granting the same, conditioned for the payment of all damages and costs which may be awarded against him, or which the opposite party may suffer or sustain by reason of the suing out of said injunction, in case the same shall be dissolved.'' See also Griffith's Miss. Chancery Practice, Injunctions, Sec. 448, p. 448. Thus the bond was sufficient.

On the question as to whether or not the appellant's demurrer, setting up no equity, an adequate remedy at law, no tender, and an attempt to set off an unliquidated claim for damages, should have been sustained instead of overruled, it is necessary to keep in mind the whole gravamen of the complaint. It must be remembered that this controversy arose between the origi-

nal parties to the contract; the rights of no innocent third persons have intervened. The appellant agreed to erect this building for a stated sum and agreed that the final amount to be secured by the second deed of trust would be due upon completion of the building. The complainant charged in effect that the defendant had failed to do this; that the roof was wholly unsatisfactory, along with certain other improper construction; that because of such failure, the business, which was the sole object for the construction of the building, was decreasing and would be ruined; that, at the time when she executed the notes and the deed of trust on which foreclosure was sought, the appellant warranted that the building was completed and that the leaks, which had appeared during construction, had been repaired; that it had not rained since such repair and she believed the appellant's representation to be true; and that as a matter of fact, the roof still leaked and that this condition was confirmed when the first rain fell, thus implying the need for proper installation of another roof to comply with the contract.

In other words, the complainant was under no duty to sign the notes and deed of trust until the building was completed. However, she signed them because Quick represented to her that everything was complete. This was not true, as subsequent developments clearly showed. Thus it was a mistake when she signed them. Obviously it would be most unusual to pay a contractor the balance of the contract price when the building was not completed, and therefore unusable for the purpose for which it was constructed, borrow additional money to finish the building, and then sue the original contractor in a court of law for the damages resulting from its failure to carry out the provisions of its agreement, with the delay and perhaps inadequacy of that court, because of the speculative nature of the evidence or other reason, to afford a plain, adequate and complete

remedy. In Griffith's Miss. Chancery Practice, the Jurisdiction, Sec. 24, p. 26, it is said: "And finally, as has already been several times mentioned, there is always jurisdiction in equity to afford relief for all such rights withheld or wrongs done or impendingly threatened to be done, so far as recognized as coming within the province and policy of remedial justice, if there be no plain, adequate and complete remedy at law, that principle and within the limits stated, being as potent for recourse to equity today as it ever was; *and its import is moreover, that the remedy at law must be as practicable and efficient to the ends of justice and its prompt administration as the remedy in equity.*" (Emphasis supplied.)

**(Hn 2)** The Court is of the opinion that the original and amended bills of complaint alleged a set of facts which warranted equitable relief and that the demurrer was properly overruled.

**(Hn 3)** Nothing whatever was said in the contract about the life of the roof. But Quick testified that his Company had built a large number of houses during the past years, and that their patrons expected to get roofs that did not leak. He refused to glaze the roof with certain material which the aluminum company guaranteed to prevent leaks for two years because he thought the complainant was entitled to a better roof than that. The evidence showed that, if leaks appear in an aluminum roof because of improper overlapping, the only way to remedy the condition is to take it off and put it on right. It was also shown that it would cost approximately $2,800 for a new roof to make it satisfactory. In view of the condition of the roof, as shown by the complainant's evidence, the court was evidently of the opinion that an aluminum roof, to be satisfactory, would have to be new and properly laid. From Quick's evidence, it is clear that he purposed and intended from the beginning to furnish the complainant a satisfactory roof.

Undoubtedly an aluminum roof, if properly installed, barring acts of God, should normally and reasonably last at least five years. Clearly that was the rationale of the chancellor by that provision in the decree. The decree therefore required that the complainant should be furnished a satisfactory roof in the full belief that a new aluminum roof, properly installed, would be good for at least five years. It is true that the warranty, which was executed on July 27, 1961, specifically guaranteed and warranted that the roof would not leak and that it would be repaired for a year after occupancy without charge. But this instrument stated that it was in addition to, and not in derogation of, all other rights and privileges that the owner might otherwise have, and this instrument inured to the benefit of the bank, and its successors in title, assigns, and transferees. The contract was incomplete to the extent of $2,800; and, until satisfaction thereof is made, foreclosure cannot be proceeded with. The appellant may acquit itself by giving credit on the notes to that effect, or furnishing the roof as required.

(Hn 4) Consequently the Court holds that the decree of the trial court did not, on account of the terms of the warranty, make another contract for the parties.

There was ample evidence to sustain the decree which was entered in this cause. Consequently it is affirmed.

Affirmed.

*McGehee, C. J., and McElroy, Rodgers and Jones, JJ.,* concur.